## McMurran, Appellant, *v.* Soria *et al.*

By the civil code of Louisiana, the separate property of the husband and wife is that which either party brings in marriage, or subsequently acquires by gift or inheritance; and it expressly denies to the husband the right to alienate the property of the wife, either *paraphernal* or *dotal.*

Where S. informed M. that he was about to trade for his note and asked him if he would make any defence to the same? M. answered that he knew of none at that time: it was held not to be such a representation as would preclude M. from impeaching the consideration of the note.

The fact that a note is payable at a bank does not, under the statute of this state, preclude the maker from setting up want of consideration, in a suit thereon by an innocent holder.

APPEAL from the circuit court for the county of Adams.

This was an action of assumpsit by the appellees against the appellant, in the circuit court of Adams county, to recover the amount of a promissory note made by the appellant to John A. Quitman, payable at the Commercial Bank of Natchez, due the first day of August, 1838, for the sum of $1,050. It was afterwards endorsed by the payee to L. R. Marshall, by him to J. T. McKnight, who endorsed it to the appellees.

The appellant pleaded *non assumpsit*, on which issue was taken, and, at the October term, 1838, of the court below, there was a verdict and judgment, in favor of the appellees, for the whole amount of the note.

It appeared upon the trial that the note sued on was given in part payment for two slaves, Levin and January, purchased by the appellant from J. T. McKnight, and that the entire consideration passed from him. It also appeared that the slave January was the property of one Sampson Ball, who died several years since, and that he continued in the family, consisting of Mrs. Ball, the widow, and two sons of the deceased, who are his heirs, up to the time when McKnight married Mrs. Ball. That Sampson Ball resided in the state of Louisiana for some years before and at the time of his death, and that his family were living in the same state at the time of the marriage of McKnight.

Several of the witnesses stated that McKnight had no slaves of any description before his marriage, and that January was the separate property of Sampson Ball, and belonged to his succession after his decease. After the sale to the appellant, by McKnight in this state, the negro ran away and returned to Louisiana, and was detained by the heirs of Ball.

It also appeared in evidence that Jacob Soria, one of the appellees, before he purchased the note, communicated to the appellant that he was about to sell goods to McKnight, and inquired if he, the appellant, would have any defence thereto, and was informed that appellant had given the note in part payment for two slaves purchased by him from McKnight, and that he knew of no defence at that time.

The counsel for the appellees requested the court to instruct the jury that if they believed the appellees were innocent *bona fide* purchasers and endorsers of the note for a valuable consideration before it became due, and were informed by the appellant before they took the said note that he knew of no defence, that the appellant could not be allowed to set up a breach of the warranty of title to said slaves as a defence against the appellees, which charge the court refused to give, but charged the jury that if they believed the appellant had no title to said slaves sold to appellee, appellant had a right to set it up as defence against the appellees, notwithstanding the answer given by the said appellant. To this charge of the court the counsel for the appellees excepted.— The appellant also requested the court to charge the jury that if they believed the negro man January was the property of the succession of Sampson Ball, deceased, the sale by McKnight did not vest a title in his vendee. This was refused, and in lieu thereof the judge told the jury that if they believed the said slave was the *paraphernal* property of the said Ball, or of his estate, that is, was the property of the said Ball before his marriage, the sale vested no title. The court was further asked to instruct the jury that if they believed said slave was the separate property of Mrs. McKnight, in the state of Louisiana, the sale by McKnight vested no title in appellant. This the judge likewise refused to give, and charged the jury that the husband had a right to sell the *paraphernal* property of the wife. The appellant excepted

to the opinion of the court in giving these charges, and brought the case to this court by appeal.

McMurran for appellant.

The first instruction asked by the plaintiff in error, namely, that "if the jury believed the negro January was the property of the succession of Sampson Ball, the sale to McMurran by McKnight vested no title," the court ought to have given in the words in which it was asked. Civil Code of Louisiana, pages, 768—770, art. 2369—2374. Our statute requires the instruction should be given or refused in the words requested, and in this instance whether we be governed by the civil or common law, the principle is equally clear. Statutes of Miss. session of 1833, page 32. Whether the property belonged to the estate or succession of a man in Louisiana, or to the estate or administrator of a man in Mississippi, the wife had not title to it as the widow of the deceased, and the sale of her second husband could confer no title at all. Civil Code of Louisiana, pages 768—770, art. 2369—2374. The civil law authorities cited, and which must prevail in this case are conclusive. They are equally conclusive that if the property was Sampson Ball's at his death, the circumstance of acquiring it before or after the marriage does not alter the case.

The error committed by the court in regard to the second instruction asked by the defendant below, is still more palpable if possible than the one just considered. No judge that ever looked into a civil law authority, could decide that the husband had the right to dispose of the paraphernal property of the wife; that the sale by him conveyed a title to the purchaser. The policy of the civil law, the first principle growing out of the doctrine of marriage partnerships, if I may so call them, is in the face of this opinion of the judge. Civil Code of Louisiana, pages 766—768. art. 2360—2368. Her paraphernal property is her separate exclusive property, which he has no more right to sell, than one partner has a right to sell the individual property of the other. Benjamin & Slidell's Dig. 177, 182. It is true, article 2367, provides that if the husband had disposed of the wife's paraphernal property for his individual use, the wife has a mortgage for the re-imbursement of the same. 3 Louisiana Reports, 70, Harrison

*et al. v.* Faulks *et al.*   But at the same time the authority does not take away her right to pursue the property if she chooses, and recover it back.   3 Mart. Reports, 455, O'Conner *v.* Barre.   It merely furnishes this additional security, but does not thereby render valid the husband's sale of her separate property.   If this rule should prevail, and the husband should be insolvent, (as in this case,) the wife would lose her property, and all means of recompense, a rule which neither the civil code nor any authority can be found to support in the slightest degree.   Sec. 2327, 2317, 2330, 2337, 2342.

Upon the authorities cited and the reasons stated, we rely upon this honorable court for a reversal of the judgment of the court below.

Montgomery on the same side.

Mr. Justice TROTTER delivered the opinion of the court.

It is very evident that by the laws of Louisiana, McKnight acquired no right to any property which belonged to the succession of Sampson Ball, by his intermarriage with the widow; and that all the property which belonged to him as his separate estate in his life time, equally belonged to his succession, whether acquired before or after his marriage.   By Art. 2314 of the Civil Code of Louisiana, it is declared, "that the separate property of either party is that which either brings in marriage, or subsequently acquires by gift or inheritance."   By instructing the jury that they must find the slave to have been the property of Ball before his marriage, in order to vest the title in his succession, the court assumed a distinction which is no where to be found in the code of Louisiana.   The instruction proceeds upon a definition of the paraphernal property of the husband, which is clearly too limited, and is open to the objection that it confines the inquiry of the jury within bounds too narrow.   If, by the limitation upon the rule relied on by the appellant, the court intended to direct the attention of the jury to the difference between community property and the separate property of either party as defined by the laws of Louisiana, it is still not perceived how the inference can aid the title of McKnight.   It is probable, that in thus modifying the scope of the instruction desired by the appellant, the court had in view

the provision of the Louisiana law, which declares "that all property which is left at the death of either party, is presumed to constitute the community of *acquits* and gains until the contrary is proved." But by another enactment of the same code, this community ceases at the death of either party. And it is not perceived how the title of McKnight could derive any strength from the supposed presumption.

In the case of community property, the survivor takes only his or her undivided moiety of the same. 7 Louis. Rep. 156. But, if under this law, the slave January fell to Mrs. Ball, he would then constitute a part of her dotal property at the time of her marriage to McKnight. And yet he could derive no power to sell it as such. Art. 2347 of the Civil Code expressly denies to the husband the right to alienate the dotal property of the wife, and he is held in respect to that, subject to all the obligations of the *usufructuary*. He has only a right to manage and receive the profits of it, but has no title to the thing itself. Art. 2342 confers upon the wife, or her heirs, the power to set aside any alienation of the dotal estate by the husband, after the dissolution of the marriage. It is true that the husband is made the head and master of the partnership, or community of gains, administers the same, disposes of the revenues which they produce, and may alienate them by an encumbered title, without the consent of his wife. The rights thus reserved to the husband in respect to the gains and effects of the partnership can, however, in no one of the cases supposed, cover the power to sell the slave in dispute. The instruction asked by the appellant should therefore have been given, and in refusing it, and charging the jury as was done, the court certainly was in an error.

It is equally evident that the court erred in charging the jury that under the laws of Louisiana, the husband has a right to sell the paraphernal property of the wife. By the provisions of Art. 2360, all property which is not declared to be brought in marriage by the wife, or to be given her in consideration of the marriage, or to belong to her at the time of the marriage, is paraphernal. This distinguishes paraphernal from dotal, and also from community property. And the law of Louisiana is studiously framed with a view to guard it against the acts of the husband, and to protect

and secure the separate rights of the wife. The rights of the husband over this portion of the wife's separate property are more limited than those over her dotal property, for he has not the right to administer her paraphernal, as he has her dotal estate, and she may, even during the coverture, claim the control and management of it, and on her death her heirs take it. How then can it be said that the husband has a right to sell it? It is answered by the counsel for the appellees, that he may do so, subject to the incumbrance of the wife's title. A stranger might do the same thing, and the concession of the proposition maintained by the argument would, therefore, entirely fail to support the sale by the husband. For, in this respect, the authority of the husband stands on no better ground than that of any third person, and in either event, the vendee would hold the property, subject to the paramount title of the wife. There is this difference, however, in the two cases: if the husband sells the property for his individual interest, the wife has a legal mortgage on all the property of the husband for reimbursing the same. Louis. Code, Art. 2367.

This provision for the protection and security of the wife, cannot however, upon any principle of construction, be interpreted to legalize the sale by the husband, which is elsewhere prohibited, and to guard against the effects of which, the legal indemnity was provided. The mortgage is a mere collateral security; a cumulative remedy, and cannot be held to deprive the wife of her primary, independent title to the thing or property in kind, or of her corresponding remedy to sue for and recover it or its value. This was so held by the supreme court of Louisiana in deciding the case of Harrison *et al. v.* Faulks *et al.* 3 Louis. Rep. 68. The negro slave which formed the subject of controversy in that case had come to Mrs. Harrison during her marriage, by inheritance from a deceased relation. The sheriff seized and sold the negro for the taxes of the husband. At the sale she was purchased by one Hughes; who afterwards sold her to Faulks, of whom she was again purchased by one Zilman. The wife brought her suit against Faulks and Zilman to recover the property, and obtained judgment. The court held, that the purchaser at the sheriff's sale acquired no other or better title than the husband had, for whose debt the slave was sold. And that as she was shown to

be the paraphernal property of the wife, and therefore exclusively her's, it was clear the husband had no title. Therefore the purchaser obtained none; and could transmit none to Faulks.

This interpretation of the provisions of the Louisiana Code, by the highest judicial tribunal of that state, is deemed as binding upon this court, as the law itself, and would control our determination though we had doubts upon the language of the code itself. It was then erroneous in the court below to charge the jury as it did in this respect. But it has been insisted in the argument, that however defective McKnight's title may be, the appellant has deprived himself of the right to urge it as a defence against the appellees, because they are endorsees for a *bona fide* and valuable consideration; and that the appellant said he had no defence against the payment of the note at the time they purchased it of McKnight. The testimony of the witness, Carson, is, that some time shortly after making the note, and before its maturity, Soria requested him to see McMurran and inform him that he was about to purchase the note, and to learn from him, McMurran, whether he had any sets off against it. That McMurran replied that he had given it in part payment for two negroes purchased of McKnight, and that he could not *then* say whether he would have any defence *or not;* but at that time he knew of none. Witness delivered this reply to Soria.

It is a well settled rule, that if a representation is made to another person, who is going to deal in a matter of interest, upon the faith of that representation, the one who made the representation shall make it good. And this the party will be bound to do whether he knew it to be false, or made it without knowing whether it was true or false. And in cases where the other party is presumed to act on the credit of the representation, it will not excuse him who made it, though the misrepresentations were innocently made by mistake. Thus A. being interested in an estate in fee, which was charged with £8,000 in favor of B. was applied to by C., who was about to lend money to B., to know if the £8,000 was still a subsisting charge on the estate. A. stated *that it was;* and C. lent his money to B. accordingly. It appearing afterwards that the charge had been satisfied; it was nevertheless held that the money lent was a charge on the lands

in the hands of A.'s heirs; because he either knew or ought to have known the fact of satisfaction, and his representation was a fraud on C.   Pearson *v.* Morgan, 2 Bro. Ch. Rep. 385, 388.   1 Story's Equity, 202.

That case went upon the ground that C. was induced to advance his money upon the representation of A. solely; and A.'s unqualified representation of the material fact of the subsisting charge on the land in favor of B., the knowledge of which peculiarly and appropriately belonged to A., was a surprise and imposition on C.   And it is well settled that the affirmation of what one does not know to be true, is equally a fraud in law, as if he knew it to be positively false.   For however innocently the mistake may be made, the other party equally relies upon it.   It induces him to act, and the other is bound to make it good.   This principle is equally applicable to the purchase of a negotiable security for money; and would bind the maker of a promissory note if he were to induce a third person to buy it, either by the influence of a direct representation that it was a valid subsisting claim, or by an express promise to pay it.   This is the extent of the rule, and the policy which sanctions it.   In order then to bring the case at bar within its operation, it must appear that there was an actual misrepresentation by McMurran, of the fact which formed the inducement or motive to the purchase by Soria; and that he was misled by it.   2 Story's Equity, 204.   2 Cox. Rep. 363.   It is not only necessary to establish the misrepresentation, but also that it actually does mislead the other party.   For if he did not trust to it, or was not misled by it, or if it was vague and inconclusive in its own nature, there is no ground for relief on the plea of fraud.   1 Bro. Ch. Rep. 546.   1 Fonb. Eq. B. 1, ch. 2.

The representation made by McMurran to Soria was only that the note was given for negroes purchased by him of McKnight, and that he could not *then* say whether or not he should have any defence against it.   Can it be seriously pretended that this statement could furnish a motive to Soria to buy the note?   Was it in any way calculated to mislead him to his injury?   Was there indeed any positive affirmation of any fact which could have any influence upon a reasonable and sensible mind?   Or was it not rather of that vague and inconclusive character which could make

14*

no impression of any sort? By the very phraseology used by McMurran in the representation relied on to charge him, Soria was apprised that if any defence against the claim should be afterwards discovered, he would avail himself of it. And indeed the language used was itself calculated to put Soria upon further inquiry. It was equally open to Soria as to McMurran to trace the title of McKnight to its origin. The appellant was not precluded by this representation from defending the suit on the ground of McKnight's want of title to the slave.

But it is further contended that by making the note payable and negotiable at the Commercial Bank of Natchez, the appellant is precluded from setting up any defence arising out of any transactions between him and McKnight, and the case of Mandeville *v.* The Union Bank of Georgetown, 3 Cond. Rep. 230, is relied upon to support this proposition. In that case the note was discounted by the Bank, which advanced its money on the credit of the promise made to it upon the face of the instrument. And it was therefore very properly held that the Bank should not be prejudiced by any defence which the maker might have against the payee. The Commercial Bank never having purchased the note in this case, the rule cannot embrace it.

Let the judgment be reversed, and a *venire de novo* awarded.